JACOB Q. TRUXAL and LELAH M. TRUXAL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Truxal v. Commissioner
Docket No. 23095-80.
United States Tax Court
T.C. Memo 1982-616; 1982 Tax Ct. Memo LEXIS 130; 44 T.C.M. (CCH) 1481; T.C.M. (RIA) 82616; October 21, 1982. Jacob Q. Truxal, pro se. Nancy B. Herbert, for the respondent. NIMS
MEMORANDUM FINDINGS OF FACT AND OPINION NIMS, Judge: Respondent determined a deficiency in petitioners' Federal income tax for the taxable year 1976 of $37,560.17. *132 The issues for decision are 1) whether this case should be dismissed with prejudice against respondent because of his alleged concession of no deficiency and his issuance of an allegedly arbitrary and erroneous deficiency notice, 2) whether petitioners or the "Lelah M. Truxal Equity Trust" earned the income of three separate businesses managed by Jacob Q. Truxal during 1976, 3) whether the "Lelah M. Truxal Equity Trust" ran afoul of any of the grantor trust provisions of sections 671 [1] through 678 in 1976 and 4) in the event petitioners are found taxable on the income of the three businesses in 1976, whether they are entitled to further section 162, section 212 or other deductions beyond those now conceded by respondent. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation and the exhibits attached thereto are incorporated herein by reference. Petitioners Jacob Q. Truxal and Lelah M. Truxal, husband and wife, resided at Cincinnati, Ohio, *133 at the time the petition was filed. On February 1, 1974, a "Declaration of Trust" for the "Lelah M. Truxal Equity Trust" (the trust) was executed on a standard form printed by Educational Scientific Publishers (ESP). The Declaration named Lelah M. Truxal as grantor-creator and Jacob Q. Truxal and Homer L. Jackson as trustees. The trust corpus was to include certain of the grantor's real and personal property and "the exclusive use of her lifetime services and ALL of the her EARNED REMUNERATION ACCRUING THEREFROM, from any current source whatsoever * * *." The trustees were given extensive management powers and were also authorized to make distributions of portions of the "proceeds" and income of the trust "as in their discretion, and according to the minutes, should be made * * *." The Declaration further stated: This Trust shall continue for a period of twenty-five years from date, unless The Trustees shall unanimously determine upon an earlier date. The Trustees may at their discretion, because of threatened depreciation in values, or other good and sufficient reason necessary to protect or conserve trust assets, liquidate the assets, distribute and close The Trust *134 at any earlier date determined by them. The Trust shall be proportionately and in a pro rata manner distributed to the beneficiaries. One hundred nonnegotiable but transferable "Beneficial Interests * * * for distribution" were created. Initially, Lelah M. Truxal was the owner of all the beneficial interests in the trust. On February 15, 1974, however, she returned her certificate of 100 units of beneficial interest to the trust for cancellation and reissuance as follows: Jacob Q. Truxal, 50 units; Lelah M. Truxal, 50 units. On February 22, 1974, all the beneficial units of the trust were again surrendered and reissued as follows: Issuee
Units
Relation to Petitioners
Marjorie F. Bacon
10
Lelah M. Truxal's mother
Richard W. Bennett
10
Lelah M. Truxal's son
Sarah Truxal Evey
10
Jacob Q. Truxal's daughter
Edith Susan Truxal
10
Jacob Q. Truxal's daughter
Jacob Q. Truxal
40
Lelah M. Truxal
20
The beneficial interests continued to be held in these proportions during 1976. Distributions of $37.93 per beneficial unit were reported in that year on the trust's fiduciary income tax return Schedules K-1. At the first meeting of the trustees of *135 the trust, held February 1, 1974, the original trustees, using another preprinted ESP form, appointed "the Grantor-Creator hereof: 1. Lelah M. Truxal to be A Trustee of THIS TRUST and to hold office for life * * *." The trustees also ratified the appointment of Jacob Q. Truxal "to hold office for life." On February 15, 1974, Homer L. Jackson resigned as trustee and Richard W. Bennett, the son of Lelah M. Truxal, was appointed trustee. Also at this time Jacob Q. Truxal was appointed "Executive Trustee" of the trust and Lelah M. Truxal "Executive Secretary" of the trust. The duties of "Executive Secretary" were nowhere defined in the documents creating such position. On February 17, 1974, petitioners learned that Richard W. Bennett refused to accept his appointment as trustee. Thereupon, Ralph L. Rogers, of Kettering, Ohio, a visitor at petitioners' house at the moment, was appointed trustee by the petitioners. Besides recording the appointment of Rogers as a trustee, the minutes of the board of trustees meeting that date state: In addition, it was resolved that a special Agreement would be established between Jacob Q. Truxal and Ralph L. Rogers whereby Ralph L. Rogers *136 would receive five (5) Certificates of Beneficial Interest from the estate of Jacob Q. Truxal upon his demise. Both petitioners and Rogers signed these minutes as trustees. The arrangement for Rogers to receive five units of beneficial interest on Jacob Truxal's death was further confirmed in minutes of a board of trustees meeting on February 22, 1974. Shortly after these events, the petitioners became concerned that the trust as then constituted would not meet certain of the requirements of sections 671 through 678 and would therefore be ineffective to shift the incidence of taxation away from the grantor. To remedy this situation, a document entitled Amendment of Declaration of Trust was prepared and signed by the creator-Grantor Helah M. Truxal on March 25, 1974. This document purported to alter the trust in the following three ways: First, it modified the trust to authorize the trustees to appoint a "consulting trustee." This consulting trustee was to have no power to vote or commit the trust to any obligation whatsoever but was permitted to perform administrative functions for the trust under the authority of the regular trustees. On March 26, 1974, Lelah M. Truxal *137 resigned her trustee position and was immediately appointed a consulting trustee of the trust. Second, it struck out the language in the Declaration of Trust assigning all Lelah M. Truxal's lifetime services and earned remuneration to the trust. Third, it added a paragraph stating: "This Trust is expressly irrevocable, and may not be altered or amended in any respect from this date forward unless specifically authorized by this instrument, and it may not be terminated except through distributions permitted by this instrument." On January 6, 1975, a document entitled "Deed" was recorded in Hamilton County, Ohio, which document recites that petitioners' residence in Cincinnati, Ohio, is transferred from Lelah M. Truxal to the trust. During 1976 petitioners continued to reside at the same address, but paid no amount of rental to the trust. During the taxable year 1976, the trust had a bank account and petitioners did not, jointly or individually, have any bank accounts in an individual capacity. Checks were written on the trust's bank account to pay all utility bills, mortgage payments and real estate taxes of the property in which petitioners resided in 1976. In addition, *138 the trust bank account was employed to pay for numerous personal items for petitioners. Both petitioners had authority to write checks on the trust's bank account as "trustee" in 1976. Minutes of a board of trustees meeting, dated November 1, 1974, state: The Trust was approached by George Thiel with a proposal to establish a business to educate individuals along financial lines so that they will be in a position to establish a trust for their own family and the protection and preservation of their personal assets. The Trustees discussed the merits of this proposal and came to the conclusion that many individuals would be interested in this service since no one is interested in having any estate taxes paid than are higher than the absolute minimum. * * * Therefore, by unanimous consent, the Trustees agreed to establish such a business venture, operating under the name of Equity Trust Associates, or ETA. The Trustees discussed the possibility of Jay Truxal serving in an administrative capacity for this business enterprise. Jay Truxal did accept this position and agreed to maintain separate records so that the Trustees would be able to receive and review operating statements *139 for this activity. In accordance with the agreement for Jay Truxal to serve the Trust, it was agreed that there would be no remuneration paid directly to Jay Truxal for the time which he spent in this capacity. All receipts would be handled through the ETA account with the net proceeds being paid to the Trust. Minutes of a board of trustees meeting, dated December 27, 1974, state: After considerable discussion and evaluating, it was resolved that the Trust would establish a bookkeeping service, operating or doing business under the name of Accounting, Management, and Professional Services. AMPS would be the acronym for this business entity. The Trustees decided that there is a great need for this type of service so that an excellent income potential should result from the minimum investment that will be required. The Trustees have agreed to place Jay Q. Truxal in charge of this entity, giving him authority to contract with other accountants in building this business. He was also given authority to contract with individuals to serve as solicitors for the business. The Trustees have requested that Jay Truxal maintain a separate record of the receipts and expenses relative *140 to this business so that a separate statement of earnings could be produced for evaluation by the Trustees, particularly considering the fact that their actions are all geared to the benefit of the Beneficiaries. With Jay Truxal agreeing to accept these responsibilities, the Trustees agreed to institute this business beginning in January, 1975, and to fund this business from Trust assets where necessary. Minutes of a board of trustees meeting, dated April 30, 1976, state: The Trust receive [sic] a booklet from Nord Davis entitled, The Curse Causeless Shall Not Come. This booklet describes a new procedure developed by Dr. Carey Reams to test urine and saliva of an individual and determine deficiencies in the individual's diet. The program enables the tester to establish a nutritional program for the individual with the goal to get their body chemistry back into a balanced position or condition. The Trustees discussed this program and it was the consensus that the Trust should participate in this program for a two-fold purpose. First the individuals in the community would be helped to a better way of life and, secondly, the Trust would realize a good income from this program. *141 After discussion, it was decided that Jay Truxal would have sufficient time to devote to this project and he indicated that he felt that he could be of real service to the Trust by developing this activity in the Trust's behalf. Therefore, the Trustee agreed to establish a new business to promote this program. The new business would operate under the name of Liberty Laboratory and Jay Truxal was given authority in an administrative capacity to develop this business. He was requested to maintain separate bookkeeping system and records and submit regular financial reports to the Trust so that the Trustees could evaluate the value of the program compared to the amount of investment required by them. It was understood that there would be a substantial investment on the part of the Trust to purchase the equipment required and the training and education sessions. But since this seems to fit well with the plans and purpose of this Trust, the Trustees gave full approval of it with the first training course being held in Roanoke, Virginia and starting on May 10, 1976. During 1976, Jacob Q. Truxal was licensed to practice as a Certified Public Accountant in the State of Ohio. During *142 the taxable year 1976, income from the accounting practice was reported on the trust's Form 1041 under the heading "AMPS;" income from the activity that analyzed urine and saliva samples was reported on the trust's Form 1041 under the heading "Liberty Laboratory;" and income from the activity involving the marketing of what were essentially modified ESP trusts was reported on the trust's Form 1041 under the heading "Equity Trust Assoc." Jacob Q. Truxal performed personal services in connection with each of the three above activities in 1976, including: bookkeeping, selling trust documents, preparing income tax returns for the trusts sold, analyzing urine and saliva samples and advising individuals of their needs for additional vitamins or minerals. On its Form 1041 for 1976, the trust reported total income from the three activities of $89,802.53 and business expenses of $72,284.13. The trust also claimed deductions of $10,188.39 for "Administrative Deductions I.R.C. 212," $612.20 for interest, $781.70 for taxes paid, $1,011.20 for depreciation and $1,131.90 for charitable contributions. On their Form 1040 for 1976, petitioners reported no wage income. *143 In fact the only income they reported that year was the $2,275.81 of distributions they received from the trust as holders of 60 units of beneficial interest. After claiming the standard deduction and two personal exemptions, petitioners reported no tax liability in 1976. In his statutory notice of deficiency, respondent determined that the income of $89,802.53 reported by the trust was properly reportable by petitioners because (1) The income reported by the Lelah M. Truxal Equity Trust represents your income which was improperly assigned. (2) Such income is taxable to you under the authority of section 671 of the Internal Revenue Code. (3) The creation of a family estate trust, the assignment of all income thereto and deduction of itemized amounts by said "trust" constitute a sham transaction, not recognized for federal income tax purposes. Respondent made no mention of the $72,284.13 of business expenses claimed by the trust in connection with the production of this income or of any of the deductions claimed by the trust. Respondent allowed petitioners a $2,800 maximum standard deduction, two exemptions ($1,500) and the elimination from income *144 of the trust distributions of $2,275.81 and then used the remaining taxable income figure ($85,502.53) as the basis for asserting a total income and self-employment tax deficiency of $37,560.17. In their petition, petitioners stated: 3. The deficiency as determined by the Commissioner is in income taxes for the calendar year 1976 in the amount of $37,560.57, of which the entire amount is in dispute. Petitioners allege that there is in fact no deficiency of tax. In his answer, respondent admitted the allegations of paragraph 3 of the petition. Prior to trial, a stipulation was entered into between the petitioners and respondent wherein respondent conceded that if petitioners were required to report as income the $89,802.53 of gross income reported by the trust, petitioners would be entitled to deductible business expenses in connection therewith in the amount of $71,264.13. Respondent further conceded a $30.41 business expense deduction for an office expense (originally claimed as an administrative expense on the trust's return) and $3,266.36 of items allowable to petitioners in computing itemized deductions (e.g., charitable contributions, interest, medical care), but *145 again only if the trust's income was properly reportable by petitioners. OPINION The first issue is whether this case should be dismissed with prejudice against respondent. Petitioners argue that this case should be dismissed either because 1) respondent admitted there is no deficiency in this case in his answer or 2) because the deficiency notice is arbitrary and erroneous. We turn first to the alleged admission of respondent in the answer. In their petition, petitioners alleged that "3. * * * Petitioners allege that there is in fact no deficiency of tax." In his answer, respondent admitted the allegations of paragraph 3 of the petition. Petitioners argue that respondent's admission was an admission that there is in fact no deficiency and thus this case is moot. We disagree. Quite obviously respondent's words only constituted an admission that petitioners allege that there is no deficiency -- i.e., that petitioners do not agree with respondent's determination. All that respondent in fact admitted to was that petitioners held a particular position in this case, not that the position itself was correct. Petitioners' second argument for dismissal of this case is *146 that the deficiency notice is arbitrary and erroneous. In particular, petitioners point out that the deficiency notice herein includes all the trust's income, but none of the trusts expenses, for 1976. After the notice was issued, respondent conceded that if petitioners must report the trust income as their own then they are entitled to the vast majority of all business expenses claimed by the trust and some other itemized deductions. Petitioners argue that respondent's failure to allow them all these concededly deductible business expenses prior to issuance of the notice renders the entire notice arbitrary and erroneous, requiring the dismissal of this case. Respondent argues that the notice was not arbitrary or erroneous because he had no opportunity prior to its issuance to see any documentation supporting the expenses deducted by the trust and that therefore he had to issue the notice in its present form to protect the revenue. Petitioners apparently concede that respondent never saw the substantiating documentation for the no longer contested deductions prior to the issuance of the notice. Petitioners allege that this happened because the parties, despite good faith attempts, *147 could not agree on a mutually convenient time to sit down and go over those records before the expiration of the statute of limitations for sending out a notice. It seems to us petitioners want to have it both ways. By not furnishing the substantiating information to respondent, petitioners forced him to disallow in the statutory notice all claimed deductions. Under petitioners' approach, if respondent were to disallow a deduction which later proved deductible, then the entire notice was arbitrary and should be dismissed. On the other hand, if respondent were to allow a deduction in the notice in order to protect against a finding of erroneous disallowance, he would be abdicating his responsibility of inquiring into the true deductibility of each expenditure. The respondent may not be whipsawed in such a manner. None of the cases cited by petitioners in any way supports their position that respondent's actions here were arbitrary. By issuing the notice as he did, respondent merely put petitioners to their proof as to the various claimed deductions. His action in so doing was reasonable under the circumstances. Chaum v. Commissioner,69 T.C. 156 (1977). *148 Respondent's subsequent concession of certain deductions on being presented with documentation merely obviates petitioners' burden of proof on these items. Petitioners' burden of proof remains as to all other deductions not conceded. [2] What is still left of this case after respondent's concessions will not be dismissed simply because it is now clear petitioners will not have a deficiency as large as that originally determined in the notice.
The next issue in this case is who earned the income of Equity Trust Associates, AMPS and Liberty Laboratories during 1976. Petitioners argue that the trust did; respondent argues petitioners did. It is well settled that income is taxed to the person who earned it. Lucas v. Earl,281 U.S. 111 (1930); Fritschle v. Commissioner,79 T.C. 152, 155 (1982); Johnson v. Commissioner,78 T.C. 882 (1982), on appeal *149 (9th Cir., Sept. 2, 1982); Pacella v. Commissioner,78 T.C. 604, 622 (1982); Keller v. Commissioner,77 T.C. 1014 (1981), on appeal (10th Cir., April 2, 1982); Vercio v. Commissioner,73 T.C. 1246, 1253 (1980); Wesenberg v. Commissioner,69 T.C. 1005, 1010 (1978). Initially we note that Jacob Q. Truxal admitted that he performed substantial personal services in connection with each of the three above-named activities. Petitioners have not shown that any other person performed services in connection with these activities. For a legal entity, such as a trust, corporation or partnership, to be recognized as the true earner of income, two things must be established: First, the service-performer must be bound by some obligation to provide services to the entity; second, the entity must be recognized by customers as the organization with which they are dealing. Johnson v. Commissioner,supra at 891. Failure of the business' customers to be aware of the formal entity's superior status may indicate *150 that they are dealing directly with the individual service-performer for his services and that the individual is merely assigning this income to the entity. See Johnson v. Commissioner,supra.
In the instant case, petitioners have limited their efforts to show that Jacob Q. Truxal operated the three business activities solely as a fiduciary for the trust, and not as his own separate proprietorships, to the introduction of the minutes of three board of trustees meetings. While these documents tend to support a finding that there was an obligation between petitioner and the trust in connection with the income of these businesses, they are insufficient, standing alone, to carry petitioners' burden of proving that the trust was the earner of the businesses' income. There is no evidence in the record to show that the customers of the businesses contracted with or even knew they were dealing with the trust. See Pacella v. Commissioner,supra. There is no evidence that the terms of the minutes of the trust were actually complied with; i.e., that Jacob Q. Truxal did in fact account to the trust for the complete earnings of these businesses. *151 See Markosian v. Commissioner,73 T.C. 1235, 1243 (1980). Furthermore, there is no evidence that any trust property was ever employed in these businesses.(Indeed we know little more about these businesses -- their assets, liabilities, manner of operation, etc. -- than what is revealed in the trust's Form 1041.) On this record, petitioners have failed to prove that the trust and not Jacob Q. Truxal was the earner of the income of Equity Trust Associates, AMPS and Liberty Laboratories in 1976. Accordingly, respondent's inclusion of the income of those businesses in petitioners' income must be sustained. Since we conclude that petitioners were the true earner of the disputed income under the assignment of income doctrine, we need not address the thornier issue of whether the trust, with or without its purported amendments, [3] satisfied the grantor trust rules of sections 671 through 678. The final issue is whether petitioners are entitled to any further section 162, section 212 or other deductions beyond those now conceded by respondent. *152 Petitioners bore the burden of proof on these items, Rule 142(a), but failed to introduce any evidence concerning them. Accordingly, petitioners are entitled to no further deductions beyond those already conceded by respondent. Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as in effect during the year in issue. All references to rules are to the Tax Court Rules of Practice and Procedure.↩
2. See Barnett v. Commissioner,T.C. Memo. 1971-93. That the concessions here were made in the stipulation, and not by amended answer as in Barnett,↩ is of no consequence.
3. Cf. Estate of Paxton v. Commissioner,T.C. Memo. 1982-464↩.